# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**DWAYNE DALTON-WEBB**,                Case No. 3:19 CV 630

    Plaintiff,

    v.                                    Magistrate Judge James R. Knepp II

**VILLAGE OF WAKEMAN,** *et al*.,

    Defendants.                           MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Dwayne Dalton-Webb brings this case against Defendants Village of Wakeman ("the Village"), Mayor Christopher J. Hipp, and Police Chief Tim Hunker[1], alleging a violation of 42 U.S.C. § 1983 (procedural due process) (Count I), as well as state law claims of wrongful discharge (Count II) and equitable estoppel (Count III). The district court has jurisdiction under 42 U.S.C. §§ 1331 and 1367 and the parties consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 10).

Currently pending before the Court are: (1) Defendants' Motion for Partial Judgment on the Pleadings as to Counts II and III (Doc. 13), to which Plaintiff responded (Doc. 20) and Defendants replied (Doc. 22); Defendants' Motion for Summary Judgment on Count I (Doc. 24), to which Plaintiff responded (Doc. 27), and Defendants replied (Doc. 29); and (3) Plaintiff's Motion for Summary Judgment on Count I, or alternatively Motion for Summary Judgment on Count III (Doc. 25), to which Defendants responded (Doc. 28), and Plaintiff replied (Doc. 30). For the reasons discussed below, the Court GRANTS Defendants' Motion for Summary Judgment as

---

1. Members of the Village Council were originally Defendants to the suit, but were voluntarily dismissed on June 25, 2019. *See* Docs 10-11.

to the Federal Due Process claim stated in Count I (Doc. 24), and DENIES Plaintiff's Motion for Summary Judgment as to the same (Doc. 25). The Court further declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and therefore REMANDS them to the Huron County Court of Common Pleas.

BACKGROUND

Village Hiring Practices

According to Tim Hunker, Chief of Police, the Village has three types of police officers: reserve officers, part-time officers, and full-time officers. (Doc. 25-1, at 13-14). Chief Hunker is the only full-time officer, and the Village employs approximately ten part-time officers and 20 reserve officers. *Id.* at 14. In contrast to part-time officers, reserve officers are unpaid and no contributions are made to the Ohio Public Employees Retirements System ("OPERS") on their behalf. *Id.* at 22-23.

Historical practice in the Village for hiring both reserve and part-time police officers was: (1) the police chief recommended an individual to the mayor; and (2) the mayor approved the officer and swore him or her in. *Id.* at 19, 24; *see also* Doc. 25-3, at 12 (Village Councilman Russell Dillon's testimony that police officers were hired by "usually the mayor and the police chief, up until this year"). A form "SF400" was required to be filed with the State of Ohio, signed by the officer, the mayor, and the police chief at the time of hiring. (Doc. 25-1, at 17-19, 21-22). The SF400 form contained a section to indicate the statutory authority for the officer's appointment. *Id.* at 24. Reserve officers were appointed under Ohio Revised Code § 737.161, whereas part-time officers were appointed under Ohio Revised Code § 737.16. *Id.* A new SF400 form was sent to the State when an officer's status changed from reserve to part-time. *Id.* at 23-24. Further, a move from reserve to part-time required the officer to undergo a physical and a drug screening. *Id.* at 27.

In historical Village practice, an officer served a six-month probationary period upon hiring as a reserve officer, and did not serve another probationary period once hired as part-time. *Id.* at 28-29. Chief Hunker explained: "we just moved them into a paid slot and there was nothing formal done through council, nothing was approved." *Id.* at 29. During this probationary period, the officer was evaluated on whether they were "a good fit for Wakeman" or other issues and could be terminated for any reason. *Id.* at 26. "[T]hen after that six months would be a structural dismissal of . . . a series of write ups or certain things", but no pre-termination hearing. *Id.* at 26-27. Councilman Russell Dillon confirmed police officer appointments were "handled by the mayor and the police chief" without Village Council involvement. (Doc. 25-3, at 8); *see also* Doc. 25-3, at 11-12.

Under this old system, part-time police officers were subject to structured discipline in the form of written or verbal reprimands. (Doc. 25-1, at 36). If an officer received three such reprimands "that would be substantial enough to terminate employment" and the police chief and mayor "would try to . . . have a paper trail of . . . whatever the reasons [were] for the person leaving". *Id.* Chief Hunker did not recall ever terminating a part-time police officer. *Id.* at 36-37.

The Village hired a new law director sometime in 2016 or 2017. *See id.* at 30, 85. At some point after August 2017, the new law director brought it to the Village's attention that, under Ohio statute, appointing a paid police officer required the Village Council to be advised of – and approve – the hire. *Id.* at 30-32; Doc. 25-5, at 11. The new law director advised the Village Council that its historical practice was improper and resulted in officers not being properly appointed under Ohio Revised Code § 737.16. *Id.* at 110-11; *see also* Doc. 25-6, at 29-34. Therefore, the procedure for hiring paid police officers changed. Chief Hunker explained:

> Well, now if you're a reserve and you move into a paid position, we let the council be aware who is moving that we recommend, the mayor recommends to move into that position. He would bring it up at a council meeting, and then let them know that he or she has started the six-month probationary period. And once that's

3

completed, the six months is completed we bring it back to council for their approval.

(Doc. 25-1, at 32); *see also* Doc. 25-1, at 110. To Chief Hunker's knowledge, the current paid

officers were not informed of the problem with historical hiring after it was identified. *Id.* at 36.

<u>Employee Handbook</u>

New Village hires – including police officers – were provided an employee handbook when

initially hired. (Doc. 25-1, at 68); *see also* Doc. 25-4 (handbook). The front page of the handbook

indicates it was originally adopted by the Village Council in May 2004 as Ordinance No. 2004-O-

15, and most recently amended in March 2011 as Ordinance No. 2011-O-2. (Doc. 25-4, at 1). The

"Purpose" section of the handbook states:

> This handbook is a general guide to the Council of the Village of Wakeman's current employment policies. All employees are responsible for knowing the entire contents of this handbook. The Council of the Village of Wakeman will review, on an annual basis, the policies, procedures and benefits which it has provided, but reserves the option to make any revisions and changes as the need arises. The Council may enhance, modify, or delete any policy, procedure or benefit at any time, including the text of this handbook, and under no circumstances should anything in this handbook be considered a contract of employment, an offer of permanent employment, or a legally binding contract. This handbook is subject to change at any time, with or without notice.

*Id.* at 5. The handbook also contains an acknowledgement of receipt that states: "I further

understand that this handbook does <u>not</u> constitute an employment contract." (Doc. 25-4, at 27)

(emphasis in original). Plaintiff signed such an acknowledgement twice. *See* Docs. 24-3, 24-5; *see*

*also* Doc. 25-8, at 20-23. Elsewhere, the handbook states that "[a]ll employees first hired after the

effective date of this policy manual will be required to satisfactorily complete a six-month

probationary period." (Doc. 25-4, at 15). It further contains information about disciplinary action

(for "minor", "major", and "intolerable" infractions), including a structured/progressive

disciplinary process with required written notices and hearings. *Id.* at 23-26.

4

Councilman Dillon testified that the handbook was "supposed to, basically" apply to all Village employees and provided "basic guidelines" but "nothing wrote [sic] in stone". (Doc. 25-3, at 10). It described how employment was "supposed to" work in the Village. *Id.* at 11. Mayor Hipp similarly testified that the handbook provided "guidelines". (Doc. 25-5, at 20). Both Chief Hunker and Mayor Hipp testified the handbook applied to all Village employees. (Doc. 25-1, at 87; Doc. 25-5, at 20).

Police Policy & Procedure Manual

The Village also had a Police Policy and Procedure Manual which it provided to new officers upon hiring. *See* Doc. 25-1, at 19 (explaining that new reserve officers are given the manual); Doc. 25-7 (manual). This manual pre-dated the Employee Handbook, but was never approved by the Village Council. (Doc. 25-1, at 84). The manual states that it provides the "rules and regulations for the Village of Wakeman Police Department . . . for the: full-time, part-time, and reserve officers[.]" (Doc. 25-7, at 6) (capitalization altered). It further provided for disciplinary procedures, including progressive discipline and hearings. *Id.* at 9-18.

Plaintiff's Employment

It is undisputed that in summer 2016, the Village – through Chief Hunker – hired Plaintiff as a reserve police officer. (Doc. 25-2, at 1-4) (SF400 Notice of Peace Officer Appointment); (Doc. 25-1, at 39-41). The SF400 form has a box checked indicating Plaintiff's status as "reserve" and that his appointment was under "Village Auxiliary/Reserve (737.161)". (Doc. 25-2, at 1, 3). It was signed by the mayor. *Id.* at 2, 4. In August 2017, Plaintiff met with Chief Hunker and Mayor Hipp to be sworn in as a part-time officer. (Doc. 25-8, at 24-25). His new SF400 indicated a status

change date in 2017[2]; it further indicated that his new status was "part-time" and that his appointment was under "Village Full-time/Part-time/Special 737.16". (Doc. 25-2, at 5). The form was again signed by the mayor. *Id.* at 6. Plaintiff underwent a physical and drug screening test at this time (Doc. 25-10) and filled out an Ohio New Hire Reporting form (Doc. 25-11). He then began receiving pay for his work, and contributions to OPERS were taken out of that pay. *See* Doc. 25-12 (September 1, 2017 paystub). Plaintiff understood he was to serve a six-month probationary period when he started as a reserve officer, but no further probationary period once starting as a part-time officer. (Doc. 25-8, at 26); (Doc. 25-9). He also understood that once the initial six-month probationary period was complete, he could only be terminated for cause. (Doc. 25-9). Plaintiff testified that he witnessed another officer undergo certain disciplinary procedures. (Doc. 25-8, at 28) ("[D]uring that time, Bunn was a corporal in the police department. And so he had his written notice and then, you know, a few months after that, he started getting write-ups and suspensions and things like that.").

In March 2018, Chief Hunker called Plaintiff and told him the mayor was terminating Plaintiff's employment. (Doc. 25-8, at 26). It is undisputed that Plaintiff was not given notice prior to his termination or a pre-termination hearing.

### STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith*

---

2. The form indicates a status change date of November 9, 2017 (Doc. 25-2, at 5), but the parties agree that Plaintiff began receiving pay in August and Defendants stipulate that Plaintiff's first paid work was August 16, 2017 (Doc. 25-1, at 81).

*Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

**DISCUSSION**

Plaintiff and Defendants filed cross-motions for summary judgment on Count I (procedural due process) and Plaintiff moved, in the alternative, for summary judgment on Count III. (Docs. 24, 25). Defendants earlier moved for judgment on the pleadings on Counts II (wrongful discharge) and III (equitable estoppel). (Doc. 13). For the reasons discussed below, the Court GRANTS Defendants' Motion for Summary Judgment on Count I (Doc. 24), DENIES Plaintiff's Motion for Summary Judgment as to the same (Doc. 25), declines to exercise supplemental jurisdiction over the remaining state-law claims and therefore REMANDS those claims to the Huron County Court of Common Pleas.

Procedural Due Process (Count I)

In Count I, Plaintiff alleges a violation of procedural due process under 42 U.S.C. § 1983. Plaintiff and Defendants each argue entitlement to summary judgment on this count, disputing whether Plaintiff had an established property interest in his continued employment with the Village. *See* Docs. 24, 25.

To succeed upon a claim under 42 U.S.C. § 1983 for a violation of procedural due process, a plaintiff must demonstrate: (1) existence of a life, liberty, or property interest protected by the

Due Process Clause; (2) deprivation of this protected interest within the meaning of the Clause; and (3) that the state did not afford adequate procedural rights prior to depriving him of that protected interest. *Gunasekera v. Irwin*, 551 F.3d 461, 467 (6th Cir. 2009). In order for a plaintiff's claim to fall into the protection of the Fourteenth Amendment, he must first demonstrate a "legitimate claim of entitlement" to a "property interest". *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). For purposes of the analysis herein, the existence of a property interest is the only pertinent issue.

"Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Golden v. City of Columbus*, 404 F.3d 950, 955 (6th Cir. 2005) (quoting *Roth*, 408 U.S. at 577); *see also EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) ("Whether a person has a 'property' interest is traditionally a question of state law."). "[A] party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *Med Corp. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002).

To support his contention that he had a property interest in his employment, Plaintiff points to: (1) the Employee Handbook and Police Manual, (2) historical practice in the Village, and (3) representations made by the mayor and police chief. He asserts that, taken together, these created an implied contract governing his employment, and provided for structured discipline procedures that were not followed. Thus, he contends, he had a property interest in his employment and could only be terminated "for cause".

As Defendants correctly point out, "[i]t has been called a 'universal rule' that a public employee does not hold his office ex contractu (that is, pursuant to contract in the sense of an agreement or bargain between him and the public), but ex lege (as a matter of law, or pursuant to statute)." *Mayer v. Ohio Dep't of Rehab. & Corr.*, 2012 WL 760826, at ¶ 18 (Ohio Ct. App.) (collecting cases); *see also Estabrook v. City of Dayton*, 1997 WL 1764764, at *5 (N.D. Ohio) ("[T]he Ohio Supreme Court has twice held that 'a public officer or employee holds his office as a matter of law *and not of contract*, nor has such officer or employee a vested interest or private right of property in his office or employment.'") (quoting *Fuldauer v. City of Cleveland*, 32 Ohio St. 2d 114, syllabus ¶ 3 (emphasis added)); *Cobb v. Vill. of Oakwood*, 789 F. Supp. 237, 240 (N.D. Ohio 1991) (relying on *Fuldauer* to hold that plaintiff, a public employee, did not have a contractual right to continued employment, as "the relationship between a governmental employer and employee is governed exclusively by statute or legislative enactment"), *aff'd*, 1992 WL 72841 (6th Cir. 1992) (affirming for the reasons stated by the district court)).[3]

---

3. Preliminarily, Plaintiff is correct that the Sixth Circuit has held that an implied contract *may* create a property interest. (Doc. 25, at 15, 18 (citing *inter alia*, *Woolsey v. Hunt*, 932 F.2d 555, 563-64 (6th Cir. 1991)). However, in *Woolsey*, the court also explained that because property interests are created by state law, any such implied-contract theory must be determined by reference to state law. *Id.* In *Woolsey* itself, because Tennessee law did not recognize implied contract claims against the State, the Sixth Circuit held that the plaintiff could not base a property interest on such a theory. *Id.* at 567-68. The same is true in Ohio. *See Cuyahoga Cty. Hosp. v. City of Cleveland,* 15 Ohio App. 3d 70, 72 (1984). A village is a municipal corporation that cannot be bound by a contract "unless the agreement is formally ratified through proper channels. As a result, a claim may not be sustained against a municipal corporation upon theories of implied or quasi-contract. Only express agreements adopted by the City in accordance with law may be enforced." *Wright v. Dayton,* 158 Ohio App. 3d 152, 159 (2004) (internal citations omitted); *see also Estabrook*, 1997 WL 1764764, at *8 ("Given this Court's earlier conclusion that Plaintiff Estabrook could not have been employed as City Manager by means of an express contract, since he held his employment *ex lege,* the Court concludes that Plaintiff is also barred from relying upon any other contract-based theory, such as implied contract or promissory estoppel, for relief."). Thus, because Ohio does not recognize implied contract claims against a village, such a theory cannot form the basis of a property interest in continued employment with the Village.

The Court thus first examines Ohio statutes regarding Village police officer appointments. The relevant state statutes governing hiring of police officers require: (1) a six-month probationary term, and (2) confirmation of such appointments by the Village Council. Specifically, Ohio Revised Code § 737.16, provides, in relevant part:

> The mayor shall, when provided for by the legislative authority of a village, and subject to its confirmation, appoint all deputy marshals, police officers, night guards, and special police officers. All such officers shall continue in office until removed therefrom for the cause and in the manner provided by section 737.19 of the Revised Code.

> Further, Section 737.17 provides (in full):

> All appointments made under sections 737.15 and 737.16 of the Revised Code shall be for a probationary period of six months' continuous service, and none shall be finally made until the appointee has satisfactorily served his probationary period. At the end of the probationary period the mayor shall transmit to the legislative authority of the village a record of such employee's service with his recommendations thereon and he may, with the concurrence of the legislative authority, remove or finally appoint the employee.

Ohio Rev. Code § 737.17. Section 737.19, to which Section 737.16 refers, provides procedures for suspension and removal of police officers. The statutes thus both require the legislative authority (here, the Village Council) to participate in the appointment of police officers. *See* Ohio Revised Code § 737.16 ("The mayor shall, when provided for by the legislative authority of a village, *and subject to its confirmation* . . . . ); § 737.17 ("[The mayor] may, *with the concurrence of the legislative authority*, remove or finally appoint the employee.") (emphasis added). Further, the statutes clearly provide that any appointment under § 737.16 requires a six-month probationary period ("*shall be* for a probationary period of six months' continuous service") (emphasis added), and is not final until (1) "the appointee has satisfactorily served his probationary period" and (2) the mayor and legislative authority "finally appoint" him, § 737.17.

10

Under Ohio law, probationary employees have no entitlement to any particular discharge procedure, nor do they have a protected property interest in their employment. *See Walton v. Montgomery Cty. Welfare Dep't*, 69 Ohio St. 2d 58, 65 (1982) ("[P]robationary civil service employment does not constitute a legitimate claim of entitlement to be accorded procedural due process under the Fourteenth Amendment."); *Curby v. Archon*, 216 F.3d 549, 553-54 (6th Cir. 2000). Further, the Sixth Circuit has explained that in Ohio "a probationary employee who completes a probationary term but is not finally appointed has no reasonable expectation of continued employment." *Matulin v. Vill. of Lodi*, 862 F.2d 609, 616 (6th Cir. 1988) (citation omitted); *Curby*, 216 F.3d at 554 ("Because Curby was not appointed, he never obtained a property interest in continued employment as a deputy marshal."); *see also State ex rel. Rose v. Ohio Dep't of Rehab. & Corr.*, 91 Ohio St. 3d 453, 457 (2001) ("As a probationary civil service employee, Rose had no property interest in continued employment sufficient to warrant procedural due process protection because her appointment was not final until she satisfactorily completed her probationary period."); *Dillingham v. Vill. of Woodlawn*, 86 Ohio App. 3d 54, 59 (1993) ("Our holding necessarily means that a police employee's probationary status does not automatically terminate at the end of the six-month period, but, rather, continues until the mayor and council concur on either removing or finally appointing him."); *Bruns v. Vill. of Chippewa Lake*, 2003 WL 21396494, at *1 (Ohio Ct. App) ("[A] probationary [chief of police] who has not attained a final appointment pursuant to R.C. 737.17 is not entitled to the protection of R.C. 737.171 upon his dismissal.") (internal quotation omitted).

Examining only these statutes, Plaintiff's status under Ohio law was – at best[4] – that of a probationary employee because he never received a final appointment as contemplated by §

---

4. Defendants argue Plaintiff actually remained an auxiliary/reserve police officer under Ohio Revised Code § 737.161 because he was never properly appointed as a probationary police officer

737.17; as such a probationary employee, Plaintiff did not have a property interest in his continued employment. *See Curby*, 216 F.3d at 554; *Matulin*, 862 F.3d at 616.

Unable to base his claim in statute, Plaintiff argues that statements from the mayor, police chief, and the Village Employee Handbook formed the "rules or mutually explicit understandings" or implied contract which justified his legitimate claim of entitlement to continued employment, that is, his property interest. Plaintiff certainly points to substantial evidence that the Village conducted its police hiring contrary to statute for a lengthy period of time. That is, the mayor and police chief hired police officers without confirmation by the Village Council as required by statute. The Court finds this is, however, insufficient to establish a property interest in light of the clear state law to the contrary.

It is true that the letter of state law alone is not necessarily determinative. In *Roth*, the Supreme Court held that property interests "are created and their dimensions are defined by existing rules or understandings that stem from . . . state law." 408 U.S. at 577; *see also Perry v. Sindermann*, 408 U.S. 593, 602-03 (1972) (teacher can have property interest in his job even absent formal contractual tenure provision if he had informal understanding with college administration). Thus, "[a] person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry*, 408 U.S. at 601. The Sixth Circuit has explained,

---

under § 737.16 due to the lack of involvement by the Village Council. (Doc. 24, at 4-6); *see also* Ohio Rev. Code § 737.16 (requiring Village Council confirmation of initial appointment). This is true, and as an auxiliary/reserve officer, Plaintiff would certainly have no property interest in continued employment. *See Curby*, 216 F.3d at 555 ("An auxiliary police officer serves no probationary period and has no statutory right to continued employment. [ ] Because auxiliary police officers serve at the pleasure of the mayor, they are terminable-at-will. . . . Because Curby had no right to continued employment as an auxiliary officer, he had no right to a hearing before being terminated.") (internal citations omitted). Even assuming *arguendo*, however, that Plaintiff was initially appointed to part-time status under § 737.16, as discussed above, he is still unable to establish a property interest in his continued employment.

however, relying on other Circuit Court case law, that "representations and customs may not create a property right where they are contrary to an existing statute or regulation." *Puckett v. Lexington-Fayette Urban Cty. Gov't*, 566 F. App'x 462, 468 (6th Cir. 2014); *see also Durham v. Martin*, 388 F. Supp. 3d 919, 940–41 (M.D. Tenn. 2019) ("A statement by defendant Ridley cannot create a binding property interest if it is in fact contradicted by state law, as indicated above."). The Fifth Circuit – upon which the Sixth Circuit relied in *Puckett* – explained the logical rationale behind this rule:

> In today's case, the employees introduced affidavits and depositions asserting that GLO practice during their period of employment (from about 1978 to 1983) was to provide adequate notice of planned dismissal and the opportunity to improve one's performance. On appeal, they argue that this practice sufficed to create a legitimate claim of entitlement protected by the fourteenth amendment.
>
> Once § 31.020 is construed as establishing at-will employment, however, cases such as *Sindermann* became readily distinguishable from today's. They are all cases in which no statute resolved whether a property interest in one's job existed. The Supreme Court's holding that an informal understanding may lead to a property interest must therefore be recognized as standing in the absence of an officially promulgated position, one way or the other, on the issue of a teacher's tenure. Here, we have interpreted § 31.020 as establishing a clear and official stand; having done so, we conclude that informal understandings and customs contrary, and subsequent, to the enactment of that statute cannot be the source of an employee's property interest. We reiterate the language of *Roth* that understandings and customs must "stem from ... state law."[] 408 U.S. at 577, 92 S.Ct. at 2709. To say that customs entirely contrary to a statute's meaning may stem from that statute would defy reason; only if consistent with official law may such practices create a property interest in one's job.

*Batterton v. Texas Gen. Land Office*, 783 F.2d 1220, 1224 (5th Cir. 1986) (footnote omitted); *see also Baden v. Koch*, 638 F.2d 486, 492 (2d Cir. 1980) (representations and customs "cannot create a property interest for the purposes of due process when they are contrary to the express provisions of regulations and statutes."); *Driggins v. City of Oklahoma City*, 954 F.2d 1511, 1514–15 (10th Cir. 1992) (holding that representations or mutual understandings contrary to an explicit city charter provision cannot lead to a property interest where officials making representations did not

13

have authority to deviate from the express city charter provisions); *Brett v. Jefferson Cty.*, 123 F.3d 1429, 1434 (11th Cir. 1997) ("While protected property interests in continued employment can arise from the policies and practices of an institution, a property interest contrary to state law cannot arise by informal custom.").

> The Sixth Circuit in *Puckett* explained that it found this analysis persuasive:

> We find the rule enunciated in *Batterton, Driggins*, and *Brett* to be persuasive. We hold that representations and customs may not create a property right where they are contrary to an existing statute or regulation. As in the cases from our sister circuits, the holdings in *Roth* and its progeny require that customs "stem from . . . state law." *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. As such, the *Batterton* court's analysis is particularly persuasive as it stands to reason that customs or representations contrary to state law are inconsistent with *Roth*'s requirement that customs stem from state law.

566 F. App'x at 470.

Applied here, this means that the Village's historical practice (or custom) of the mayor appointing police officers (citing Ohio Revised Code § 737.16) *without* confirmation by Village Council, and *without* a separate six-month probationary period, cannot form a "mutually explicit understanding" to establish a property interest because that custom is expressly contrary to the requirements of state law regarding such hiring. *See* Ohio Rev. Code § 737.16-17. More broadly, an understanding that a probationary employee has a property interest in his job is contrary to Ohio statutes that an employee has no such interest until finally appointed (with Village Council confirmation) and thus "inconsistent with *Roth's* requirement that customs stem from state law." *Puckett*, 566 F. App'x at 470. Indeed, as another Judge in this District recently explained:

> The fact that Mayor Pulley mistakenly cited 737.171 in his letter to the Village Council does not bestow upon Reed a property interest in his employment that is contrary to his probationary status under R.C. 737.17. A property interest is created by state law. *See Board of Regents v. Roth*, 408 U.S. at 577 ("Property interests ... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law..."). Under Ohio law, Reed was required to satisfactorily serve a six-month probationary period upon his initial

appointment as police chief before being eligible for final appointment. He did not satisfactorily serve a six-month probationary period and he was never finally appointed. Reed does not cite legal authority that holds that a village mayor can intentionally or unintentionally circumvent Ohio law to create a property interest where a state statute expressly negates such an interest. *C.f. Winfield Constr. Inc. v. Oakton, Inc*., 2005 WL 1423439, at * 5 (Oh. Ct. App. June 17, 2005) ("persons [dealing with municipal corporations] are not entitled to rely on actions of municipal corporations *or their agents when pertinent statutory requirements are not met*[,]" quoting *Williamsburg v. Milton*, 619 N.E.2d 492, 495 (Oh. Ct. App. 1993) (emphasis in original)).

*Reed v. Vill. of Wilmot*, 2019 WL 4750668, at *5 (N.D. Ohio). The fact that Mayor Hipp or Chief Hunker checked a box on the SF400 indicating Plaintiff was appointed under § 737.16 "does not bestow upon [Plaintiff] a property interest in his employment that is contrary to his probationary status under R.C. 737.17." *Id.* And as in *Reed*, Plaintiff here "does not cite legal authority that holds that a village mayor can intentionally *or unintentionally* circumvent Ohio law to create property interest where a state statute expressly negates such an interest." *Id.* (emphasis added) Thus, he cannot rely on the – incorrect – representations and understandings of the mayor, police chief, or Village Council members to establish an implied contract-based property interest where those representations were directly contrary to state law requirements. As the *Reed* court also recognized, citing Ohio law, representations cannot circumvent statutory authority. 2019 WL 4750668, at *5. As one case cited therein explained:

"It has long been the law of Ohio that persons dealing with municipal corporations are charged with notice of all statutory limitations on the power of such corporations and their agents, and must, at their peril, ascertain whether all necessary statutory formalities have been met. *Kimbrell v. Seven Mile* (1984), 13 Ohio App. 3d 443, 445, 469 N.E.2d 954 (citations omitted). "Such persons are not entitled to rely on actions of municipal corporations *or their agents when pertinent statutory requirements are not met. Williamsburg v. Milton* (1993), 85 Ohio App. 3d 215, 219, 619 N.E.2d 492 (citation omitted).

*Winfield Constr. Inc. v. Oakton, Inc.*, 2005 WL 1423439, at *5 (Ohio Ct. App.) (emphasis in original). Thus, by virtue of the statutes themselves, Plaintiff was on notice that the mayor and

police chief had no unilateral authority to: (1) appoint him to a part-time police officer position absent confirmation by the Village Council; or (2) waive the mandatory six-month probationary period upon starting as a part-time officer. *See* Ohio Rev. Code § 737.16 ("The mayor shall, when provided for by the legislative authority of a village, *and subject to its confirmation* . . . . ); § 737.17 ("[The mayor] may, *with the concurrence of the legislative authority*, remove or finally appoint the employee."); § 737.17 (any appointment under § 737.16 "*shall* be for a probationary period of six months' continuous service" and is not final until "the appointee has satisfactorily served his probationary period" and the mayor and legislative authority "finally appoint" him) (emphasis added).[5]

Moreover, the Village Handbook and Police Manual, despite their description of disciplinary procedures do not change this analysis. First, there is no "property right in government procedures themselves." *Janosek v. City of Cleveland*, 718 F.3d 578, 582 (6th Cir. 2013) (citing *Richardson v. Twp. of Brady*, 218 F.3d 508, 517-18 (6th Cir. 2000)). Second, the Police Manual was never adopted by the Village Council and thus the Village never evidenced an intent to be bound by it. (Doc. 25-1, at 84). Third, *Golem v. Village of Put-in-Bay*, upon which Plaintiff relies for his implied-contract-based-on-handbook theory, is distinguishable. Therein, the court found an employee manual/handbook established an implied contract which could establish a

---

5. As the Ohio Supreme Court recently explained:

> "'Shall' means must." *Wilson v. Lawrence*, 150 Ohio St.3d 368, 2017-Ohio-1410, 81 N.E.3d 1242, ¶ 13, quoting *Application of Braden*, 105 Ohio App. 285, 286, 148 N.E.2d 83 (1st Dist.1957). "[W]e repeatedly have recognized that use of the term 'shall' in a statute connotes a mandatory obligation unless other language evidences a clear and unequivocal intent to the contrary." *Id.*, citing *State ex rel. Cincinnati Enquirer v. Lyons*, 140 Ohio St.3d 7, 2014-Ohio-2354, 14 N.E.3d 989, ¶ 28.

*State v. Noling*, 153 Ohio St. 3d 108, 122–23 (2018).

property interest in employment. 222 F. Supp. 2d 924, 930 (N.D. Ohio 2002). The court relied upon, in part, the lack of a disclaimer in the manual to find the plaintiff could establish a property interest based on implied contract. *Id.* ("While the Manual allows the employer unilaterally to amend the Manual, the Manual *does not disclaim the creation of a contract* or state that it simply is a guide. The absence of such disclaimer manifests Put–In–Bay's intent to be bound by the Manual.") (emphasis added) (document citation omitted). By contrast, the handbook here contains just such an explicit disclaimer. *See* Doc. 25-4, at 5 ("under no circumstances should anything in this handbook be considered a contract of employment, an offer of permanent employment, or a legally binding contract"). Moreover, Plaintiff signed an acknowledgement (twice), which stated: "I further understand that this handbook does not constitute an employment contract." *See* Docs. 24-3, 24-5; *see also* Doc. 25-8, at 21-23.

Although Plaintiff is correct that it appears the Village codified the handbook, and that the handbook (like the manual in *Golem*) contains detailed and specific requirements for discipline, the Court finds the explicit disclaimer is dispositive of Plaintiff's property interest claim.

First, "employee handbooks are not in and of themselves a contract for employment." *Wright v. Honda of Am. Mfg., Inc.*, 73 Ohio St. 3d 571, 575 (1995). "[A]n employee handbook may provide the terms and conditions of an at-will employment relationship . . . if the employer and employee manifest an intention to be bound by the handbook provisions." *Finsterwald–Maiden*, 115 Ohio App. 3d 442, 446 (1996). Absent such a mutual assent to be bound, "the handbook is simply a unilateral statement of rules and policies that creates no obligation or rights." *Id.*[6] Second, and more importantly, under Ohio law, "[a]bsent fraud in the inducement, a disclaimer in an employee handbook stating that employment is at will precludes an employment

---

6. Again, the Village Council never adopted the Police Manual so it never evidenced an intent to be bound by anything therein. *See* Doc. 25-1, at 84.

contract other than at will based upon the terms of the employee handbook." *Wing v. Anchor Media Ltd. of Tx.*, 59 Ohio St. 3d 108, syllabus (1991). Similarly, a handbook that expressly disclaims any intent to create a contractual relationship cannot constitute an employment contract. *Karnes v. Doctors Hosp.*, 51 Ohio St. 3d 139, 141 (1990). Northern District of Ohio cases interpreting Ohio law have come to the same conclusion. *See Abel v. Auglaize Cty. Highway Dep't*, 276 F. Supp. 2d 724, 742 (N.D. Ohio 2003) ("A critical aspect that Abel has overlooked is that the employee handbook in that case contained no disclaimer, which the *Golem* court held manifested the employer's intent to also be bound.") (distinguishing *Golem*); *Senter v. Hillside Acres Nursing Ctr. of Willard, Inc.*, 335 F. Supp. 2d 836, 843 (N.D. Ohio 2004) ("When the handbook disclaims intent to create a contract or provides that it may be unilaterally amended or altered by the employer at any time, there is no mutual assent to be bound.") (citing *Abel*, 276 F. Supp. 2d at 742; *Karnes*, 51 Ohio St. 3d at 141 ("The manual specifically disclaims any intent to create a contractual relationship between employer and employee and the language of the receipt signed by appellant further underscores that no such construction was intended."); *Finsterwald–Maiden*, 115 Ohio App. 3d at 447)). In *Wing*, the Ohio Supreme Court explained that it agreed with the lower courts' determinations "that the disclaimer contained in both the confirmation of employment and the handbook, *irrespective of the terms of the handbook*, bars a finding of a contract of employment other than an at will relationship." 59 Ohio St. 3d at 110 (emphasis added).

Thus, the disclaimer contained in the handbook – and Plaintiff's express acknowledgement thereof – demonstrates the Village's lack of intent to be bound and prevents Plaintiff from relying on the handbook as an implied contract establishing a property interest in his employment. *See* Doc. 25-4, at 5 ("under no circumstances should anything in this handbook be considered a contract of employment, an offer of permanent employment, or a legally binding contract"); Docs.

24-3, 24-5 ("I further understand that this handbook does <u>not</u> constitute an employment contract."). *Golem*, with its lack of a such a disclaimer, is distinguishable.

Thus, for the reasons stated above, the Court finds Plaintiff cannot show a genuine issue of material fact as to whether he had a property interest in his continued employment as a part-time police officer with the Village. Without such an interest, his procedural due process claim necessarily fails.

<u>State Law Claims (Counts II and III)</u>

Plaintiff is correct that for many years, the Village did not properly appoint police officers, despite apparently believing it was doing so. However, as discussed above, this error did not violate federal due process. Plaintiff's original complaint asserted both federal and state law claims. *See* Doc. 1-2. "The district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Blakely v. United States*, 276 F.3d 853, 861 (6th Cir. 2002) (quoting 28 U.S.C. § 1367(a)). Thus, on removal, this Court had original jurisdiction over Count I and supplemental jurisdiction over Counts II and III. Having granted Defendants summary judgment on the federal claim contained in Count I, the Court is left only with the alternative state law claims contained in Counts II and III. When a district court dismisses all claims over which it had original jurisdiction, it may decline to exercise supplemental jurisdiction over the remaining state-law claims. *Id.* at 862; *see also* 28 U.S.C. § 1367(c). In deciding whether to exercise supplemental jurisdiction, the court should consider "'judicial economy, convenience, fairness, and comity.'" *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir.1996) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). When, as here, the Court dismisses all federal claims before trial, the court should

generally deny jurisdiction over the state-law claims. *See Robert N. Clemens Tr. v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 853 (6th Cir. 2007); *see also Jackson v. Washtenaw Cty.*, 678 F. App'x 302, 309 (6th Cir. 2017) ("Given Defendants' entitlement to qualified immunity on the § 1983 claims, the district court did not err in declining to exercise jurisdiction over the supplemental state-law claims.").

The remaining state law claims – asserting wrongful discharge in violation of public policy and equitable estoppel – involve solely the interpretation of Ohio law. Comity dictates that these are questions for a state, rather than a federal, court. Accordingly, Plaintiff's wrongful discharge in violation of public policy and equitable estoppel claims (Counts II and III) are REMANDED to the Huron County Court of Common Pleas. *See Musson Theatrical, Inc.*, 89 F.3d at 1254–55 ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."); *see also* 28 U.S.C. § 1367(c)(3) (stating that a district court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it ha[d] original jurisdiction").

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants' Motion for Summary Judgment as to the Federal Due Process claim stated in Count I (Doc. 24) be, and the same hereby is, GRANTED; and it is

FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 25) as to the Federal Due Process claim stated in Count I be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and therefore REMANDS them to the Huron County Court of Common Pleas.

s/ James R. Knepp II
United States Magistrate Judge